IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

v.    Criminal Case No. 07-50063-001

JUAN MAGANA-AGUIRRE                                          DEFENDANT

O R D E R

On the 31st of October, 2007, defendant's **Motion To Suppress Evidence** (document #28) came on for hearing, and from the evidence adduced, and the arguments and briefs of counsel, the Court finds and orders as follows:

1.  Defendant is charged by Indictment with one Count of knowingly possessing, with intent to distribute, more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine.  The substance was allegedly seized from a vehicle being driven by defendant on July 3, 2007.

Defendant's motion raises two challenges to the traffic stop that resulted in his arrest.  He contends that there was neither probable cause nor reasonable suspicion to stop his vehicle, and that his subsequent consent to search of the vehicle did not purge the taint of the unconstitutional stop.

2.  At the hearing, the government presented testimony from two witnesses: Mel Carver ("Carver"), who at the time was an Arkansas State Highway Patrol ("ASHP") officer, and who made the traffic stop; and  Laurencio Rivera ("Rivera"), a Special Agent

with the Drug Enforcement Administration ("DEA"), who had been conducting an undercover operation involving defendant.

3.    Carver testified that on the day of the arrest, he had been notified by the DEA to be on the lookout for a white Ford van traveling through the Fayetteville area toward Alpena, Arkansas. He was informed that the van was believed to contain a shipment of narcotics, and to be alert to any opportunity to stop the van for a traffic violation.  Carver testified that the reason for using a traffic stop to bring about the search and seizure of the van was to protect the identity of a confidential information ("CI") working on the case.

Carver testified that shortly after he fell in behind the van, he observed it swerve to the right and cross the fog line. At that point he turned on the videotaping equipment in his patrol car, and recorded the van drift toward and onto the fog line several more times.  The video also reflects the van drift over to the center line, and shows an erratic pattern of tapping on the brakes.

Carver testified that he stopped the van and approached the driver, obtaining his driver's license and asking him a few questions to determine if he was drunk, tired, or otherwise impaired.  He also ran standard record checks on defendant's license, and learned that the defendant - who is not a United States citizen - had been convicted of illegal entry in 2004, had

been excluded from the United States following an unprosecuted charge of alien smuggling in late 2006. He called in an agent of the Bureau of Immigration and Customs Enforcement ("ICE"), and wrote defendant a warning citation for "improper lane use."

Before giving the citation to defendant, Carver testified that he asked if defendant had any drugs or weapons in the van. Defendant said he did not, and Carver then asked if he could search the van, to which defendant agreed. Shortly thereafter, a dog handler arrived with a drug-sniffing dog. The dog can be seen on the video alerting repeatedly near the front fender on the driver's side of the van.

At that point defendant was arrested, and after a brief search in which Carver determined that more time would be needed, the van was driven to DEA headquarters in Fayetteville, where it was searched and the drugs were found.

Carver testified that even if he had not been instructed to look for an opportunity to make a traffic stop of the van, he would have stopped it based on his experience as a highway patrolman because the drifting pattern, and the tapping of the brakes, were suggestive of drunk driving. He also testified that if he had been asked to do so by the DEA, he would have stopped the car to search it for drugs, even without observing a traffic violation.

-3-

4.   Rivera testified that he had been conducting an undercover operation involving defendant since June, 2007, when he learned from the "CI" of a man known as "Primo" who lived in the Dallas area and was said to traffic in methamphetamine.  Rivera was able to make an association between "Primo's" phone number and defendant, and also was able to obtain a photo lineup which included defendant, whom the CI identified as the man he knew as "Primo."

Rivera testified that through the CI, an order was placed with "Primo" for 15 pounds of methamphetamine.  Rivera was present when the CI made the call, listened in on the call while it was being made, and recorded the call.

Rivera testified that on July 2, 2007, "Primo" and the CI agreed that the methamphetamine would be delivered to the CI's residence in Alpena, Arkansas, on the morning of July 3, and that "Primo" would notify the CI shortly before he arrived in northwest Arkansas.  Rivera then arranged for surveillance units to cover the various roadways which defendant might use to get to Alpena, hoping to catch defendant through a traffic stop so as to protect the identity of the CI, who was involved in an on-going investigation. Had no traffic violation occurred, Rivera testified that he would have asked the ASHP to stop the van on the basis of his information that it contained drugs.

-4-

As it turned out, defendant traveled the road on which Carver was stationed.  Near Huntsville, Arkansas, the van rendezvoused with a vehicle driven by Rivera and the CI, and Rivera testified that he was able to verify that defendant was driving it and had the drugs with him.  Rivera was in radio or telephone contact with Carver, and shortly after the van left the gas station, Carver fell in behind it and effected the traffic stop.

5.   The applicable law is set out in a recent Eighth Circuit case on point, **U.S. v. Herrera-Gonzalez**, **474 F.3d 1105 (8th Cir. 2007),** as follows:

> A traffic stop is reasonable under the Fourth Amendment if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred.  Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an objectively reasonable one. . . . Finally, the constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop.

**474 F.3d at 1109** (internal citations and quotation marks omitted).

The Court finds that Carver acted in an objectively reasonable manner in stopping the van, based on his experience as a highway patrolman and his observation that the van was drifting over the fog line and the driver was tapping his brakes in an erratic manner.  While the drifting shown in the video was not extreme, Carver testified that the first drift he observed took the van well over the fog line, and that the pattern he observed

was, in his experience, typical of drunk driving. Although Carver's subjective motivation was admittedly to effect a drug-related arrest, that is irrelevant when the Court considers whether the traffic stop he carried out was reasonable under the Fourth Amendment. A pattern of driving suggestive of drunk driving qualifies as a reasonable suspicion that a traffic violation is occurring.

6. Having determined that the traffic stop was supported by reasonable suspicion, the Court need not consider whether defendant's consent to the search purged the taint of an illegal stop. Were it necessary to make such a determination, the Court believes that the circumstances here do qualify in that regard. In **<u>Herrera-Gonzalez</u>**, the court noted that "[e]ven if a traffic stop is determined to be invalid, subsequent voluntary consent to a search may purge the taint of the illegal stop if it was given in circumstances that render it an independent, lawful causes of the officer's discovery." **474 F.3d at 1111.**

**<u>Herrera-Gonzalez</u>** identifies three factors to consider in a "purging the taint" inquiry:

* How much time elapsed between the initial traffic stop and defendant's consent to search?

* Were there any intervening circumstances that justified the police officer in asking for consent to search?

* How "flagrant" was the misconduct of the police officer?

-6-

Here, the time elapsed between Carver's stop of the van and his request for consent to search was over 12 minutes. This is sufficient under **Herrera-Gonzalez**.

In addition, intervening circumstances justified Carver is asking for consent to search. From his standard check of defendant's driver's license, he learned that defendant had illegally entered the country on one occasion, had been excluded from the country, and had been charged -- albeit not prosecuted -- for smuggling aliens.

Finally, as noted above the Court does not find fault with Carver's conduct in stopping the van, but even if a reviewing court should view the matter differently, this Court does not believe any court would find his conduct "flagrant" or "egregious" in any respect. Thus, the Court finds that defendant's consent would have been sufficient to validate the search even if the traffic stop did not survive constitutional scrutiny.

7.   There is another, and completely sufficient, basis for Carver's stop of defendant and search of the van. In **U.S. v. Williams, 429 F.3d 767 (8th Cir. 2005),** the Court considered a case very like the one at bar. There, DEA agents believed that a vehicle contained controlled substances, and requested of traffic officers "that the [vehicle] be stopped if probable cause could be established" for the stop. The car was then pulled over for going too slowly and crossing the center line while approaching a curve.

In considering a challenge to the traffic stop, the Eighth Circuit noted the well established rules that "even a minor traffic violation provides probable cause for a traffic stop," and that a traffic-violation arrest "would not be rendered invalid by the fact that it was a mere pretext for a narcotics search." **429 F.3d at 771** (internal quotation marks omitted).  The court then went on to state:

> In the alternative, we also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop Caldwell's vehicle, and such knowledge was imputed to the officer at the scene when he received Sgt. Sergeant's radioed request.

**429 F.3d at 772-3.**

In the case at bar, Rivera's testimony establishes that he had probable cause to believe that defendant was driving the van, and was illegally transporting a large quantity of a controlled substance.  Rivera communicated this information to Carver, and such imputed knowledge clearly would justify Carver in stopping and searching the van.

For the foregoing reasons, the Court finds that defendant's **Motion To Suppress Evidence** (document #28) should be, and same hereby is, **denied.**

IT IS SO ORDERED, this 1st day of November, 2007.

                                   **/s/Jimm Larry Hendren**
                                   **JIMM LARRY HENDREN**
                                   **UNITED STATES DISTRICT JUDGE**